UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

v.

D-1   Kevin Fordham,
          Defendant.

Case No.  21-20354

Hon. Jonathan J.C. Grey

---

### United States' Sentencing Memorandum as to D-1 Kevin Fordham

---

Defendant Kevin Fordham referred to himself as the "mother-fu\*\*ing king" over AVLN. (Tr. Ex. 3815)[1].  He acted as Chief of the Insane Vice Lords (IVL), holding the deciding vote for all of Michigan on the National Board.  He threatened and endorsed violence, blessed the illegal use of firearms, and profited from drug sales in and around the Detroit area.

For these reasons, a guideline sentence is "sufficient, but not greater than necessary, to comply with the purposes of sentencing set

---

[1] Exhibit A contains the transcripts of trial exhibit recordings that were admitted at trial.

forth in 18 U.S.C. § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008).

## I.   Facts and procedural history

Having sat through trial in this case, the Court undoubtedly remembers the facts of this case.  The Almighty Vice Lord Nation operated a sophisticated and complicated criminal enterprise.  Prince Fordham held a triple role: (1) Chief of the IVL branch; (2) deciding vote on the Michigan Board; and (3) member of the Al-Shabazz National AVLN Board.



According to Defendant Fordham, he involves himself in settling disputes between branches. (Tr. Ex. 2945). He decided on the Nation's business. (*Id.*; Tr. Ex. 3605). Lower ranking members flocked to him to report AVLN business. (Tr. Ex. 3718; 3635; 3651; 3658). They reported to him on prison activity. (Tr. Ex. 3801; 3851). They sought permission to inflict violence. (Tr. Ex. 3704). And they assisted him in trafficking narcotics.

The jury returned an inconsistent verdict. But the sentencing court is not bound to only consider convicted conduct, and for good reason. A sentencing court finds guideline levels and enhancements by a preponderance of the evidence and may consider many facts that existed outside the trial day. The only times where a sentencing court must rely solely on a jury's factual findings occur when the factual finding increases the statutory maximum sentence, or when the jury's factual findings increases a mandatory minimum sentence. *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 570 U.S. 99 (2013). That is not the case, here.

To be clear: The United States does not seek to increase a mandatory minimum, nor does it seek to increase a statutory maximum. The United States is not even seeking to have this Court extrapolate and estimate an amount of drugs outside of law enforcement seizures, though it is well within the Court's power to do so. *See United States v. White*, 563 F.3d 184, 196 (6th Cir. 2009) (drug quantities are established by a preponderance of the evidence and a conservative estimate will suffice). A preponderance of the evidence exists to demonstrate that Fordham

4

should be held accountable for the drugs seized for both counts four and five.

## II. The PSR should reflect an offense level of 42, criminal history I, for a guideline range of 360 months – 540 months' imprisonment.

The purpose of a presentence report is to provide the Court with all relevant information pertaining to a particular defendant, as well as all relevant conduct surrounding the convicted offenses. Information utilized by the Court for purposes of sentencing is not limited to trial exhibits and trial testimony. It is also not limited to the drug conspiracy. All acts occurring in the RICO conspiracy that Fordham committed, or were foreseeable to him by others, must also be included in the guideline calculations.

Sentencing enhancements and facts are proven by a preponderance of the evidence, not beyond a reasonable doubt. *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc). The Court may even consider acquitted conduct for purposes of sentencing. *United States v. Watts*, 519 U.S. 148 (1997); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc); *United States v. Brika*, 487 F.3d 450 (6th Cir. 2007) (citing cases).

Hearsay is permissible both in terms of relaying of information in a PSR, as well as at a sentencing hearing. *United States v. Silverman*, 976 F.2d 1502 (6th Cir. 1992); *United States v. Katzopoulos*, 437 F.3d 569 (6th Cir. 2006). Confrontation of witnesses does not apply in the sentencing context. *United States v. Stone*, 432 F.3d 651 (6th Cir. 2005).

Racketeering activity is considered "underlying racketeering activity" under USSG § 2E1.1 for the purpose of calculating a defendant's base level for a RICO conviction if it constitutes relevant conduct as defined in USSG § 1B1.3." *United States v. Tocco*, 306 F.3d 279, 286 (6th Cir. 2002). Relevant conduct includes:

(1) all acts or omissions that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused; and

(2) all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during, in preparation for, or in the course of attempting to avoid detection or responsibility for the RICO conspiracy.

*Tocco*, 306 F.3d at 286 (*citing United States v. Corrado I*, 227 F.3d 528, 542 (6th Cir. 2000)).  In other words, the underlying acts of racketeering in a RICO conspiracy are considered conduct that is relevant to the central objective and counts as "relevant conduct" for sentencing purposes.

Indeed, a RICO defendant who is acquitted of specific racketeering acts under a special sentencing allegation may nonetheless be sentenced based upon that very same act if the defendant is convicted of the overall RICO conspiracy.  That is because the incident of which the defendant was acquitted may remain relevant conduct under USSG 1B1.3.  *United States v. Rios*, 830 F.3d 403, 440 (6th Cir. 2016).

### A. The base offense level should be 32.

Defendant Fordham should be held accountable for at least 6,552.50 kilograms of converted drug weight. (USSG § 2D1.1(c)(4)).  As the United States explained at trial, the RICO conspiracy involved both the Count Four and Count Five drug conspiracies.



### 1. Count Four drug conspiracy

At trial, the United States dubbed Count Four as the "Freeland Street conspiracy" between Fordham, other IVLs and TVLs.  While this is the count that the jury acquitted, this Court need only find by a preponderance of evidence that Fordham agreed to the conduct, and that the amounts were reasonably foreseeable as to him.

***Fordham's leadership role in AVLN***.   Evidence at trial demonstrated that Fordham held three different leadership positions for AVLN: the Chief of the Insane Vice Lord Branch; the deciding vote on the Michigan AVLN Board; and a seat on the National El-Shabazz AVLN

Board.  Fordham knew about the enterprises' drug trafficking activities and participated, directed, organized, and profited from them.

*Fordham's admissions*.  To start, Fordham himself reminisced about the days that he and other AVLN were "moving dope like a mutha f\*\*ker." (Tr. Ex. 3612).  Fordham discussed purchasing houses on Freeland to take over more drug distribution locations.  (Tr. Ex. 3644).  The wire calls were replete with references to the AVLN selling drugs on Freeland. (*See, e.g.*, Tr. Ex. 3600, 3602, 3603, 3610, 3642, 3670, 3675).  SA Nether testified regarding the volume of marijuana sales moving through Antoine Coleman's Freeland house, as well as Fordham's sales to others.  Additionally, the jury heard about supplier Rasean Walker, who had a full basement marijuana grow operation for the AVLN drug conspiracy.

*Seized drugs*.  The combination of seized drugs from members of the IVL/TVL drug conspiracy add up to a converted drug weight of 231.5 kilograms.[2]

---

[2] In keeping with the Department of Justice's view on the current crack v. powder cocaine ratio disparity, all types of cocaine were treated as "powder" for purposes of calculating the guideline range.

| Drug | Net weight | Converted drug weight |
| --- | --- | --- |
| Cocaine (including cocaine base) | Approx. 1 kilo | 2 kilos |
| Fentanyl | Approx. 45 grams | 112.5 kilos |
| Heroin | Approx. 24 grams | 24 kilos |
| Methamphetamine | Approx. 44 grams | 88 kilos |
| Marijuana | Approx. 5 kilos | 5 kilos |
| **total** | | **231.5 kilos** |

***CI-27016 testimony***.  CI-27016 testified that Freeland was "the Holy Block," and he had personally seen Fordham at the location selling drugs.  (ECF No. 1325, PageID.9783-84).

As the Chief of his branch, Fordham knew (or could reasonably foresee) that drug sales reached far and wide and frequently occurred. For example, during an undercover purchase from CI-27016, Fordham inquired as to which part of the state CI-27016 intended to distribute. (Tr. Ex. 2945).  CI-27016 also testified that Fordham would call him to

inquire as to whether CI-27016 needed to be resupplied.  (ECF No. 1326, PageID.9931).

The wiretap calls also demonstrated that members of all different AVLN branches called Fordham to report all sorts of misconduct, problems, and sought direction.  Fordham never seemed surprised when an AVLN member reported that law enforcement took drugs out of a gang location.   While Fordham carefully worded his crimes on recorded lines, his coconspirators were not so discreet.  Many IVL and TVL members openly advertised "boy" and "girl."  They posed with money on social media.  They engaged in numerous sales through text messaging and Facebook.

To be clear, the United States is not seeking this Court to extrapolate any additional drug trafficking as to Fordham, though evidence exists to show that Fordham daily sold marijuana.  And evidence on electronic media devices proved that his lower-ranking AVLN members worked hard to distribute narcotics to the community.

11

### 2. Count Five drug conspiracy

At trial, the United States labeled Count Five as the "Mafia drug conspiracy" between Fordham and the MIVLs. While the jury did not find large amounts of fentanyl as to Fordham beyond a reasonable doubt, this Court need only find by a preponderance of evidence.

***Fordham's leadership role in AVLN***. Again, as a Chief with the deciding vote on the Michigan Board, Fordham regularly interacted with MIVL Chief Eddie Reid. Drug trafficking that benefited MIVL also benefited, and was blessed, by Fordham.

***Fordham's admissions***. Fordham and Reid discussed national drug trafficking and the sale of "Christina Aguilera," slang for cocaine. During the conversation, Reid informs Fordham that the reason he was able to get the "deal" was because it was someone Fordham knew. Fordham's reply? "Right." He is not surprised. In fact, Fordham tells Reid that the same ALVN have been trying to get Fordham to purchase directly from them. (Tr. Ex. 3641). It is clear from the wiretap calls that moving large amounts of the "straight work" that does not need to be cut with filler is something Fordham knows about and endorses.

*Seized drugs*.  The combination of just the physically seized drugs from members of the MIVL drug conspiracy add up to a converted drug weight of 6,321 kilos.

| Drug | Net weight | Converted drug weight |
|---|---|---|
| Cocaine | 5 grams | 1 kilos |
| Fentanyl | Approx 2.5 kilo | 6,250 kilos |
| Heroin | 70 grams | 70 kilos |
| **Total** | | **6,321 kilos** |

Adding the two converted drug weights yields a total of 6,552.5 kilograms of converted drug weight that was reasonably foreseeable as to Fordham, through both his leadership role and his own admissions.  The PSR should reflect an offense level under USSG § 2D1.1(c)(4) of 32.

## B. Fordham qualifies for the (+2) enhancement for use of a dangerous weapon. (defense objection)

The probation department added (+2) under USSG 2D1.1(b)(1) for possession of a dangerous weapon.  (PSR ¶ 92).  Defendant Fordham objected because the jury acquitted him on Count 41, possession of firearms in furtherance of drug trafficking.  But again, Defendant

13

Fordham's argument is foreclosed by Sixth Circuit caselaw that explicitly allows consideration of acquitted conduct. The guidelines take a more expansive view of possessing a dangerous weapon, and the relevant conduct should not just be limited to the drug counts.

The application note indicates that the enhancement should be applied if "the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG 2D1.1, note 11. As the photos below show, one loaded long gun was propped up next to the bed, within a few feet of a side table containing packages of marijuana in various sizes, a digital scale, and packaging materials:





Two additional long guns were found in the same room. Agents found a Mossberg 12-gauge shotgun on the other side of the bed, and a loaded Winchester model 100 .308 caliber rifle by the closet. The Winchester was near a plastic bag containing 23 knotted baggies of marijuana. All told, Fordham had over two pounds of marijuana in various stages of preparation for sale in a very small bedroom.

Fordham lived in the Hubbell Street home. The two long guns were located within a very close distance to the marijuana Fordham sold. Fordham admitted the guns belonged to him. And Fordham discussed

his access to firearms in the TIII wiretap calls.  For example, in a TIII call on February 23, 2021, Fordham boasted that "[s]ome shit went down and . . . I pulled up with the straps." (Tr. Ex. 3613)

The burden is now on Defendant to show that it was "clearly improbable" that the firearms were connected to his offense.  *United States v. Sierra-Villegas*, 774 F3d 1093, 1102 (6th Cir. 2014).  This he cannot do.

### C. Fordham qualifies for the (+2) enhancement for maintaining a drug premises. (defense objection)

Defendant objects to the (+2) enhancement under USSG 2D1.1(b)(12), arguing that trial evidence failed to show he used the Hubbell Street home to manufacture drugs.  But the evidence in this case belies his claim.

This enhancement applies to anyone who "knowingly opens or maintains any place for the purpose of manufacturing or distributing a controlled substance."  *United States v. Bell*, 766 F.3d 634, 636-37 (6th Cir. 2014) (*citing United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).  The Sixth Circuit has clarified that the drug trade need not be the

sole purpose for the home. *Id*. And the drug activity may occur in just a portion of the house, such as a room or enclosure. *Id*.

Fordham maintained a drug premises. *First*, Fordham held no legitimate employment. While he made claims of work to probation, none of that was ever verified.

*Second*, while Fordham lived in the location with his girlfriend, she, too, assisted him with his drug transactions. See, e.g., Tr. Ex. 226, Fordham cell phone at 15, where she texted Fordham and asked, "how much is the half boy going for?" The wiretap contains volumes of calls between Jacquiline Jones and Fordham engaging in drug transactions. Just a small example:

02.05.21 – Fordham asked Jones if she wanted to "serve the guys a gram real quick." Jones agreed. Fordham told her to "give them one of the dark boys." She said okay. (session 0037).

02.25.21 – Fordham told Jones that "Lackey" was outside and to "give him a twenty." Jones agreed. (session 1662).

18

03.12.21 – Fordham and Jones discuss her testing of marijuana. Jones told Fordham it was better than "our product." (session 2573).

03.21.21 – Fordham told a drug purchaser that his "wife" would give him the drugs. (session 3788).

The evidence shows that Fordham maintained a drug premises, while his girlfriend, Ms. Jones, assisted in facilitating drug sales.

*Third*, Fordham engaged in narcotics sales in front of this house. Each of the controlled buys described below occurred in front of the Hubbell Street house, where Fordham entered and exited directly before and after the sales.

On March 16, 2021, CI-27016 purchased marijuana from Fordham. When CI-27016 arrived at the Hubbell Street house, Fordham walked outside and got in CI-27016's car. During the deal, Fordham offered to hook up CI-27016 with his "man" to purchase crack cocaine. Fordham called to facilitate the sale. CI-27016 agreed but had to obtain more money. After meeting with ATF, CI-27016 returned to the Hubbell Street house and sat with Fordham until Fordham's supplier, Zanie Taliaferro,

arrived with the crack cocaine.  Again, the deal took place in front of Fordham's house.  (Tr. Ex. 2945).  A week later, at another controlled purchase, CI-27016 purchased crack cocaine and marijuana from Fordham.  That buy took place in front of Fordham's house.

On April 26, 2021, CI-27016 purchased approximately two ounces of crack cocaine and 1/2 pound of marijuana from Fordham.  Fordham walked directly out of his Hubbell Street house and accompanied CI-27016 to a nearby house to pick up the drugs. (Tr. Ex. 2960).  About two weeks later, CI-27016 again purchased two ounces of crack cocaine and a 1/2 pound of marijuana from Fordham.  Fordham again walked out of his Hubbell Street house, obtained the crack cocaine from co-conspirator Clifford Green, and took a bag of marijuana out of his own truck in the driveway.  Fordham completed the deal in his driveway, sitting next to CI-27016.  (Tr. Ex. 2963).

*Finally*, agents found "tools of the trade" at the Hubbell Street house, including a digital scale, drug packaging materials, firearms, and a large amount of cash – approximately $930.00. As the *Bell* court noted, "precedents under the guideline do not carve out residences as safe

havens from being drug-production premises.  *Bell*, 766 F.3d at 638.  This enhancement applies.

### D. Fordham qualifies for the (+2) enhancement for the use of violence. (United States objection)

USSG provides for a (+2) enhancement if "the defendant used violence, made a credible threat to use violence, or directed the use of violence." USSG 2D1.1(b)(2).   A credible communication of an intent to injure another, without acting on it, also qualifies.  *United States v. Pineda-Duarte*, 933 F.3d 519, 522 (6th Cir. 2019).

This enhancement is applicable here.   Fordham regularly used violence, credible threats of violence, and directed the use of violence, in furtherance of the RICO conspiracy and in furtherance of his drug trafficking.  Fordham threatened that the lower ranked AVLN needed to "get in tune or get tuned up."  (Tr. Ex. 3852).

CI-27016 testified that AVLN would kill anyone trying to sell drugs on Freeland that were not associated with them. (ECF No. 1325, PageID.9793).  In wire calls, Fordham discussed forcibly removing people from Freeland.   For example, when discussing other people stealing customers:

FORDHAM:     But n**ga I'll be damn if I let y'all come step on, step y'all feet on that motherfucker on Freeland and start pumping that bitch up.

And n**ga the right motherfuckers ain't in play to get the, to reap the benefits. Fuck that. I'll start sending the guys through there. N**ga, robbing n**gas and everything.

(Tr. Ex. 3642).

Most concerning is the fact that neither Fordham nor any other AVLN member ever reports criminal acts to law enforcement.  Instead, they handle everything with their own version of justice, truth, and punishment.  Below are a few examples of violent behavior that Fordham participated, endorsed, or encouraged.

***Arranging a firearm for Ondrome Lewis.***  On March 27, 2021, Fordham's son called Fordham to report that someone driving off Freeland shot at him and he needed bullets. Lewis called again, this time asking for "some guns."  Fordham stated that he would see what he could arrange.  Fordham told Lewis he was going to call "C-Four" (co-defendant Winisford Watkins) because Fordham knew Lewis "need[ed] some big shit."  What Fordham did not know, though, was that the ATF had seized Watkins' phone the day or two before.  It appears the seizure was just in

time because Fordham had already obtained a "clip" from someone.  But the clip did not fit in "the other one."  He needed the correct fitting clip for "the K."   The ATF probably prevented a murder, albeit unknowingly. (*See* Tr. Ex. 3659; 3661; 3663; 3664; 3665; 3681).

**Retaliation for Queen Sugar's assault.**   On April 17, 2021, AVLN member Teona White (Queen Sugar) contacted Fordham to report an assault.  She explained that the attackers told her she was "out of law."  Photos documented her chipped tooth, bruises, and other injuries. Fordham's response? "Whatever you want to do, let us know.  You already know."   Meantime, Fordham told White that "they done fucked with the wrong one," because he "ain't fitting to let that shit slide."   Fordham planned to locate the perpetrators to send his minions to "get his ass tore up."  (Tr. Ex. 3688; 3689; 3690; 3691; 3699; 3711).

**Ordering a violation on Saluddin Fouche**.   In spring 2021, multiple AVLN reported to Fordham that Fouche talked to law enforcement regarding an AVLN homicide and had claimed false rank. In response, Fordham called his "enforcer" Brandon Thomas and asked if he was going to "take care of that situation."   Fordham also discussed

Fouche being unable to "beat the whole mob," and Fouche needed to "go watch the sun set [die]." (Tr. Ex. 3604; 3605; 3606; 3631; 3654; 3655; 3658; 3677; 3682; 3683; 3684; 3692; 226 at 7).

***Ordering a violation for Martrez Robinson***.  In March 2021, AVLN member J.G. reached out to Fordham to report that AVLN member Martrez Robinson (a.k.a. "Ugly") beat up her minor child.  IN fact, he broke her jaw.  In response, Fordham called "enforcer" Brandon Thomas to "take care of that situation."  But apparently AVLN Charles Douglas already "beat his ass."  Fordham concluded with satisfaction that "Chuckles already handled the situation."  (Tr. Ex. 3628; 3629; 3631; 3632; 3633; 4217).

***Retaliation for Ponce Brown's murder***. In late March 2021, AVLN reported to Fordham that IIVL leader Ponce Brown died. Not only did Fordham offer his assistance with restructuring the branch, but he also discussed his plan to have AVLN members show up in court to identify Brown's killer to take revenge. (Tr. Ex. 3647; 3649; 3650; 3652).

***Exposing CI-27016.*** The day of his arrest, Fordham immediately began trying to determine who may have violated AVLN law by snitching

to law enforcement.  And keeping in line with the AVLN law, Fordham

promised to take revenge:

> FORDHAM: Yeah, now see, that's another reason I know up front
> now.  I know.  I know exactly who it is bro.  I know exactly who it
> is, because lil' bro came over and told me that he told him that they
> got me and his phoned tapped on a conversation.  Lil bro came over
> on a motorcycle and told me that shit last week.  So, I know who did
> it.  I know who it is then.  Cause how the fuck you know that.
>
> WATKINS: Right. How you know the phones tapped?
>
> FORDHAM: Right.
>
> WILHITE: [U/I]
>
> FORDHAM: Naw, when you just said that, I put two and two
> together. I know who it is.  I ain't going to expose him in front of
> everybody but I'm going to expose him for the people that's
> supposed to know.  You know what I'm saying.

(Tr. Ex. 4205).  For these reasons, USSG 2D1.1(b)(2) applies.

### E. Fordham qualifies for (+4) adjustment for his role as leader/organizer of AVLN. (defense objection)

The guidelines state that if the defendant acts as an organizer or

leader of a criminal activity that involved five or more participants, or

was otherwise extensive, four levels are added to the offense level.  USSG

§ 3B1.1(a); *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002).

Fordham acted as the leader of AVLN, which placed him in a position to oversee and manage the AVLN drug sales.  In February 2021, Fordham recalled to another AVLN member that when they "moved on Freeland," they were "moving dope like a mutha fucker."  (Tr. Ex. 3612).  According to Fordham, business was "boomin' like a mutha fucker."  CI-27016 testified that AVLN sold drugs on Freeland for over ten years.  (ECF No. 1326, PageID.9904).

Fordham's influence over AVLN drug activity (as well as all other AVLN business) spans decades and reached numbers of soldiers.  Even limiting the members to just those discussed at trial, and limiting the individuals to the Insane Vice Lord branch, Fordham ruled over these eleven IVL members: Johnson, Kenneth (LB), Averette, Roy (Schizo), Coleman, Antoine (Shaq), Douglas, Charles (Chuckles), Hunter, Harith (Reef), Johnson, Artise (Out Kold), Knight, Aaron (Ace), Thomas, Brandon (Boss Hog), Thompson, Kurteiz (Tez), Walker, Rasean (Motor), Watkins, Winisford (C-4).

But Fordham's authority did not stop with IVL, even when concerning drug transactions.  As discussed above, he acted as the

26

deciding vote for Michigan on all branch matters. And he held a coveted seat on the Al-Shabazz National Board. AVLN's main purpose was to traffic drugs across the country. Fordham's role as a leader has been adequately established to justify the enhancement.

## III.   Section 3553(a) factors warrant a guideline sentence.

The Supreme Court has noted that, in formulating the Sentencing Guidelines, the U.S. Sentencing Commission's goal is to carry out the objectives of 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338 (2007). While advisory, the Guidelines remain an important factor in fashioning a just sentence. This is because "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.* at 350. Moreover, the guidelines "should be the starting point and the initial benchmark" for choosing a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).

### a.   The nature and circumstances of the offense

The nature and circumstances of these offenses are obviously serious. Fordham's role in AVLN perpetuated violence in and out of

prison, recruited young men into a life of crime, and participated in the devastation of drug addicts across the country. His desire for power—and then revenge—saw no boundaries. Fordham did not hesitate to order violence to ensure that no AVLN violated the most important law: keeping quiet in the face of law enforcement.

### b.    The history and characteristics of the defendant

The history and characteristics of this defendant also warrant a guideline sentence. While Defendant will argue that he has no prior felony convictions, that can be attributed, in part, to AVLN ranking. He admitted his involvement in AVLN spanned decades. And if AVLN operates as a criminal organization (it does), then Fordham involved himself in criminal activity for years without getting caught. Fordham was keenly aware of the need to avoid prison phones, lay low, and order those below him to execute the violence on the street. For that, he should not be rewarded. Not only did Fordham rise to the top of the rankings, he engaged his son Ondrome Lewis in criminal activity as well. Fordham's history and characteristics support a guideline sentence.

### c.   Seriousness of the offense, promotion of respect for the law, and just punishment for the offense

As noted above, the circumstances of Fordham's offense should not be taken lightly.  His actions demonstrate that he has no respect for the law.  His crimes are serious, not just because they involve violence and deadly drugs, but also because he stands at the head of thousands of lower-ranking AVLN that are ready to blindly obey his orders without question.  Not once during the investigation did Fordham ever contact law enforcement to put a stop to pending murder conspiracies, drug deals, or any other violence.  Quite the opposite: he endorsed it.  And for that, a guideline sentence is just punishment.

### d.   Adequate deterrence and protection of the public

This defendant needs to be deterred.  Because AVLN believe they are AVLN for life, and there is no leaving this organization, the only deterrence the Court can provide is to keep the public safe from Fordham's rule.

      **e.**    **Providing defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; kinds of sentences available and the need to avoid unwarranted sentencing disparities**

The Bureau of Prisons has the expertise to classify and assign Fordham to the appropriate facility. A guideline sentence is presumed to be reasonable. And the top of this chain of command should receive the highest sentences.

## IV.    Conclusion

The United States requests this Court to make specific findings of fact that support the enhancements requested, and find the offense level to be 42, with a criminal history I. Based on that calculation, the United States recommends a guideline sentence of **360 – 540 months' imprisonment.**

Respectfully submitted,

DAWN N. ISON
United States Attorney

*s/ Margaret M. Smith*
Margaret M. Smith
Blake Hatlem
Danielle Asher

Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9100
margaret.smith@usdoj.gov

Dated:  April 2, 2024

**Certificate of Service**

I certify that on April 2, 2024, I electronically filed the United States

Sentencing Memorandum with the Clerk of the Court of the Eastern District of

Michigan using the ECF system which will send notification of such filing to the

Attorney of record.

s/ *Margaret M. Smith*
Assistant U.S. Attorney
United States Attorney's Office